**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**



JUSTIN MICHAEL WOLFE,

     Petitioner,

v.                              CIVIL ACTION NO. 2:05cv432

HAROLD W. CLARKE, DIRECTOR,
VIRGINIA DEPARTMENT OF CORRECTIONS,

     Respondent.

### Order Enforcing Judgment

Before the Court is Petitioner's Motion to Enforce Judgment (ECF. No. 257) of the Court rendered in previous proceedings that directed the Commonwealth of Virginia to "within one-hundred and twenty (120) days of the date of this Order, provide Petitioner with a new trial, or release him unconditionally from custody." The Petitioner argues that because the Commonwealth has failed to complete a retrial of Petitioner within the 120 days given by the Court for said purpose, he should be released unconditionally now. The Commonwealth, however, argues that based on its view of how 120 days should be calculated in this case, its time to try the Petitioner has not yet expired. Furthermore, even if the Petitioner's assertions regarding the timing in this case are correct, the Commonwealth believes that it has complied with this Court's order by initiating proceedings to retry the Petitioner. Having considered the memoranda and conducted a hearing, this matter is ripe for decision.

### I. FACTUAL AND PROCEDURAL HISTORY

On January 7, 2002, a Prince William County jury convicted Petitioner, Justin Wolfe, of capital murder (murder-for-hire), use of a firearm in the commission of a felony, and conspiracy to distribute marijuana. As a result of his convictions, Wolfe was sentenced to death on the

270

murder-for-hire charge and prison terms of thirty years and three years, respectively, on the conspiracy and firearm charges. Wolfe filed an appeal in the Supreme Court of Virginia on the capital murder conviction and filed an appeal in the Virginia Court of Appeals on the firearm and drug convictions. The non-death penalty cases were certified to the Supreme Court of Virginia and consolidated. The Supreme Court of Virginia dismissed the petition on March 10, 2005, and the United States Supreme Court denied Wolfe's petition for writ of certiorari on July 8, 2005. On November 7, 2005, Petitioner filed his federal habeas petition under the authority of 28 U.S.C. § 2254 ("§ 2254 claim"). On August 7, 2007, the Magistrate Judge issued a Report and Recommendation declining to conduct an evidentiary hearing and recommending that his petition be dismissed. On February 11, 2008, this Court adopted the Report and Recommendation and dismissed Wolfe's petition. Wolfe then filed a motion to alter or amend the judgment, which this Court denied on May 15, 2008.

On June 18, 2008, Wolfe filed his notice of appeal. On September 12, 2008, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") granted Wolfe a certificate of appealability on his extraneous influence, venireman, *Brady*, and *Giglio* claims. On May 11, 2009, the Fourth Circuit affirmed the district court's rulings on the extraneous influence claim and the venireman-counsel subpart, and vacated this Court's ruling on the *Brady*, *Giglio*, and venireman-court subpart claims. *Wolfe v. Johnson*, 565 F.3d 140 (4th Cir. 2009). Additionally, the Fourth Circuit remanded the case for a determination under *Schlup v. Delo*, 513 U.S. 298 (1995), and to decide whether an evidentiary hearing was appropriate. *Id.* On February 4, 2010, this Court issued a Memorandum Opinion and Order finding that Wolfe had satisfied the *Schlup v. Delo* standard to pursue his § 2254 claim. Furthermore, the Court granted Petitioner's Motion for an Evidentiary Hearing on his *Brady* and *Giglio* claims and reserved its ruling on Petitioner's

venireman-court claim. This Court conducted a four-day evidentiary hearing on Petitioner's *Brady* and *Giglio* claims beginning on November 2, 2010.

On July 12, 2011, this Court issued a Memorandum Opinion and Order granting Petitioner's habeas petition on three grounds. First, this Court found that Petitioner was deprived of his right to due process pursuant to the Fourteenth Amendment, as interpreted in *Brady v. Maryland*, to be apprised of all material, exculpatory information within the hands of the prosecution. Second, this Court found that the Commonwealth's use of witness Owen Barber's false testimony was grounds for habeas relief under both *Stockton v. Virginia* and *Giglio v. United States*. Third, this Court found that Petitioner was denied his Sixth Amendment right to an impartial jury. Accordingly, the Clerk entered judgment for Petitioner on July 12, 2011. On July 26, 2011, this Court issued an Amended Memorandum Opinion and Order, which made only technical changes to its Order of July 12, 2011 but did not alter any of the Court's rulings. On August 4, 2011, the Commonwealth filed a notice of appeal. On Petitioner's motion, this Court amended its judgment ("Amended Judgment") of July 12, 2011 on August 30, 2011 to further clarify that it granted habeas relief as to Petitioner's convictions on all charges, since the denial of Wolfe's right to due process permeated his entire state criminal trial. The Amended Judgment directed that "[t]he Commonwealth of Virginia shall, within 120 days of the date of this Order, provide Petitioner with a new trial, or release him unconditionally from custody."

On September 2, 2011, the Commonwealth then filed a notice of appeal of this Court's Amended Judgment. The Commonwealth filed a Motion for a Temporary Stay Pending Appeal on September 13, 2011. On November 22, 2011, the Court stayed its Amended Judgment "during the pendency of the Director's appeal to the Court of Appeals for the Fourth Circuit." On August 16, 2012, the Fourth Circuit affirmed this Court's habeas decree in a written opinion.

On September 7, 2012, the Fourth Circuit issued its mandate, ending the Commonwealth's appeal of the Court's habeas decree, and thus lifting the stay issued by the Court. On November 16, 2012, Petitioner filed his "Motion to Enforce Judgment" before the Court ("Motion to Enforce"). On November 30, 2012, the Commonwealth filed its opposition to the motion with the Court ("Opposition Brief"). On December 6, 2012, Petitioner filed its rebuttal ("Reply Brief"). On December 13, 2012, the Court held a hearing on the motion as well as directed the Commonwealth to show cause as to why extraordinary circumstances do not exist in this case to warrant barring current and further prosecutions of Petitioner for all charges related to both drug conspiracy and the death of Danny Petrole.

## II. DISCUSSION

Petitioner's motion raise three questions. First, is whether the Commonwealth has complied with the Court's order that "[t]he Commonwealth of Virginia shall, within 120 days of the date of this Order, provide Petitioner with a new trial, or release him unconditionally from custody." If the Commonwealth has complied with the order, no further analysis is necessary. Second, if the Commonwealth has failed to comply with the conditional writ, the Court must determine the appropriate remedy for the violation. Third, if there are extraordinary circumstances which allow for the barring of further reprosecution of the Petitioner, what should be the scope of any bar to reprosecution?

### A. Whether the Commonwealth Complied with the Court's Writ

According to Petitioner, the Commonwealth has failed to provide him with a new trial within 120 days and thus should be released unconditionally. Wolfe's version of the relevant chronology is as follows:

- On August 30, 2011, the Amended Judgment is entered, starting the 120-day period to provide a trial;

- 84 days pass;
- On November 22, 2011, the Court entered a stay for the pendency of the Commonwealth's appeal to the Fourth Circuit;
- On August 16, 2012, the Fourth Circuit issued its opinion affirming the Court's habeas decree;
- On September 7, 2012, the Fourth Circuit issued its mandate, formally ending the Commonwealth's appeals and lifting the stay issued by the Court, thus restarting the 120-day period;
- 36 days pass;
- On Saturday, October 13, 2012, the 120-day period to provide Wolfe a new trial expired. Because the deadline fell on a weekend, it moved to the next business day, Monday, October 15, 2012.

Under the Petitioner's timeline of events and view of the Court's order, his trial should have been completed by Monday, October 15, 2012 or the Commonwealth should have sought additional time from the Court to complete the trial, which is currently scheduled for January 2013.

The Commonwealth rejects all of Petitioner's arguments on the question of timing. The Commonwealth argues that the lifting of the Court's stay pending the Commonwealth's appeal to the Fourth Circuit had the effect of *resetting*, rather than *restarting* the 120 days the Court gave the Commonwealth to provide Petitioner with a new trial. Under this view, the Commonwealth believes it had 120 days from the issuance of the mandate to try Wolfe and thus its time has not yet expired. Citing the Court's order concerning the Commonwealth's request for a stay pending its appeal to the Fourth Circuit, the Commonwealth argues that:

> This Court thereby made clear what it intended: the stay did not merely suspended the time period allowed for retrial or *toll* the running of its order; rather, it wholly set aside the judgment granting relief. This Court expressly ordered that Wolfe's convictions and sentences would remain in full force and effect upon the entry of the stay.

Resp't's Br Opp. 2-3, Nov. 30, 2012, ECF. No. 258 (emphasis in the original). The Commonwealth goes on to assert that:

During the pendency of the appeal, therefore, the final judgments in Wolfe's criminal trials were undisturbed. Had this Court merely tolled, or extended, the 120-day period within which to retry Wolfe, the convictions and sentences would have remained vacated during the period of tolling. But the Court expressly removed its judgment altogether during the appeal, and expressly reconstituted the validity of the criminal judgments of convictions and sentences, as if no judgment of vacation had occurred.

*Id.*

In the alternative, the Commonwealth argues that even if the 120-day period has expired,

it has complied with the Court's order because it re-indicted Petitioner for the original charges

and also for new charges in the Circuit Court for Prince William County and is now currently

moving through pre-trial proceedings:

On the very day the mandate issued, the Director released Wolfe from his custody, and surrendered him to the custody of the Prince William County authorities, in whose custody he remains. Wolfe is in custody, not on the vacated convictions and sentences, but rather as a pretrial, untried defendant whose bail has been denied.

Resp't's Br Opp. 4. As a corollary of this argument, the Commonwealth contends that

the Court no longer has jurisdiction in this case as the Petitioner is not being held as a

result of his unconstitutional conviction, but rather for the reinstituted and newly charged

crimes, for which he was denied pre-trial release:

Wolfe fails to acknowledge that the Commonwealth reinstituted retrial proceedings at the bond hearing held only one week after the Fourth Circuit issued its mandate, thereby fulfilling this Court's judgment that the Commonwealth provide him with a new trial within 120 days of its judgment. The state trial court certainly must be able to manage the retrial, including continuances as it deems necessary. This Court has no continuing or supervisor role over the state court. *Cf Pitchess v. Davis*, 421 U.S. 482, 490 (1975) ("Neither Rule 60(b), 28 U.S.C. § 2254, nor the two read together, permit a federal habeas court to maintain a continuing supervision over a retrial conducted pursuant to a conditional writ granted by the habeas court.").

Resp't's Br Opp. 8.

Understanding the arguments of both parties and the lack of clear, controlling case law on a number of issues, the Court turns to its findings and conclusions regarding whether a violation of the Court's order occurred in this case. The Court notes that both parties, but particularly the Commonwealth given its responsibilities under the Court's Amended Judgment, should have sought clarification if there was any ambiguity in the Court's Amended Judgment. Instead, it appears the Commonwealth sought clarification of the Court's Amended Judgment from the Prince William County Circuit Court Judge assigned to this case. The law, however, dictates that "district courts are in the best position to interpret their own orders." *JTH Tax, Inc. v. H&R Block E. Tax Servs.*, 359 F.3d 699, 705 (4th Cir. 2004) ("When a district court's decision is based on an interpretation of its own order, our review is even more deferential because district courts are in the best position to interpret their own orders.") (citations omitted).

Furthermore, the Fourth Circuit has clearly held that "to sustain appellate review, district courts need only adopt a reasonable construction of the terms contained in their orders." (citations omitted). In construing terms contained in an order, the Fourth Circuit recognizes that "[w]hile dictionaries are undoubtedly useful tools of construction, there is no requirement that district courts adopt the definitions contained therein when construing the terms of their own orders." *Id.* at 706. The Court does recognize, however, that "[i]nsofar as the district court's determination was based upon interpretations of law, however, we review those conclusions de novo." *United States v. Under Seal (In re Grand Jury Subpoena)*, 597 F.3d 189, 195 (4th Cir. 2010).

In the instant case, the Court's Amended Judgment was unambiguous. The Commonwealth had two clear choices, to either: (1) provide Petitioner with a new trial within 120 days; or (2) release him unconditionally from custody, putting an end to this whole bungled

prosecution. The Commonwealth has maintained, both on paper and at the December 13, 2012

hearing, that it complied with the Court's Amended Judgment by releasing the Petitioner from

the bonds of his unconstitutional state convictions and that he is now being held on pre-trial

detention for the reasserted and new charges.

The Commonwealth's contentions are wrong as they conflated the options presented to it

in the Court's Amended Judgment. In presenting the option of releasing the Petitioner

"unconditionally" from custody, the Court used the word "unconditionally" in its traditional and

widely understand context: "Not limited by a condition; not depending on an uncertain event or

contingency; absolute." *Black's Law Dictionary* (9th ed. 2009). Under this meaning of the word

"unconditional," it is self-evident that releasing Petitioner from the custody of the Virginia

Department of Corrections to Prince William County for the purposes of retrial did not constitute

releasing Petitioner "unconditionally from custody."

Instead, the Commonwealth availed itself of the option to provide the Petitioner with a

new trial. In doing so, the Commonwealth subjected itself to the continued jurisdiction by the

Court to ensure that it complied with the conditions of retrial, i.e. that a new trial be provided

within 120 days. The continued jurisdiction of this Court to ensure its writ is complied with is

well recognized, as the Sixth Circuit noted in *Gentry v. Deuth*, 456 F.3d 687, 692 (6th Cir.

2006):

> [D]istrict courts retain jurisdiction to execute a lawful judgment when it becomes
> necessary. If the state complies with its order, the petitioner will not be released;
> if the state fails to comply with its order, release will occur. Ordinarily, the only
> task that remains for the district court is the execution of judgment. A federal
> district court retains jurisdiction to determine whether a party has complied with
> the terms of a conditional order in a habeas case. A state's failure to timely cure
> the error identified by a federal district court in its conditional habeas order
> justifies the release of the petitioner. On the other hand, when a state meets the
> terms of the habeas court's condition, thereby avoiding the writ's actual issuance,
> the habeas court does not retain any further jurisdiction over the matter.

*Id.* (internal quotations and citations omitted). Taken together, the Commonwealth did not release Wolfe unconditionally within the meaning of the Court's Amended Judgment and instead took the option of providing him with a new trial.[1]

Given that the Commonwealth did not comply with the Court's order to release Petitioner unconditionally, the next question is whether the Commonwealth violated the Court's 120 day deadline for retrial. As outlined above, the Commonwealth argues that it did not violate the deadline for two reasons. First, it argues that the lifting of the stay entered during the pendency of the Commonwealth's appeal to the Fourth Circuit operated to reset, rather than restart the 120 clock. The Commonwealth cites two cases in support of its position, *Michael Williams v. Netherland*, No. 3:96-cv-529 (E.D. Va.) and *Fisher v. Rose,* 757 F.2d 789 (6th Cir. 1985). The reliance on both of these cases is wholly misplaced. Reading the Commonwealth's view of *Williams*, it is not clear how it supports its argument. Not only does the court in that case not make any pronouncement or rule regarding the operation of a stay or the lifting of one but indeed the state in that case sought an extension of the time given by the court to conduct a retrial because circumstances in the case prevented the set deadline from being met. *Michael Williams*

---

[1] In *D'Ambrosio v. Bagley*, 656 F.3d 379, 381 n.1 (6th Cir. 2011), a habeas case similar to the instant case supports the Court's conclusion. In *D'Ambrosio*, the district court directed the state to "(1) set aside [Petitioner's] convictions and sentences as to all counts of the indictment, including the sentence of death; or (2) conduct another trial . . . within 180 days from the effective date of this Order." As the Commonwealth does in this case, the State of Ohio argued that it complied with the order by vacating the conviction and sentences of Petitioner, which Ohio believed deprived the district court of jurisdiction. The Sixth Circuit rejected this argument, finding that:

> The state also failed to satisfy the other alternative for compliance with the conditional writ as it did not set aside D'Ambrosio's conviction and sentences. Indeed, the warden did not even contend, until oral argument at least, that the state had complied with that alternative. Here, the state clearly chose to conduct a new trial, even though it failed to do so, and there is no indication that the state at any point in time decided instead to exercise the setting-aside alternative. Therefore, the state never complied with the conditional writ in D'Ambrosio's case, and the district court retained jurisdiction over it. See *Gentry*, 456 F.3d at 692. The warden even conceded as much when seeking from the district court an enlargement of time to retry D'Ambrosio.

*D'Ambrosio,* 656 F.3d at 386.

*v. Netherland*, No. 3:96-cv-529, ECF No. 223 (E.D. Va., Nov. 14, 2002). As the Court will expound upon below, this is precisely what the Commonwealth should have done in this case.

The second case the Commonwealth cites is *Fisher v. Rose,* 757 F.2d 789 (6th Cir. 1985). In that case, the habeas petitioner sought release after arguing the state prosecutor in that case failed to retry him within the prescribed set by the district court. *Fisher*, 757 F.2d at 791. The Sixth Circuit rejected this argument, stating that "[l]ess than sixty days after this court issued the mandate affirming the district court's granting of the writ..." proceedings were on-going to retry the defendant. *Id.* The Commonwealth argues that this statement indicates that the Court of Appeals reset, rather, than simply restarted the clock toward reprosecution or release. Again, it is not clear how the *Fisher* case is applicable. The Sixth Circuit did not make any pronouncement or rule regarding the operation of a stay or the lifting of one. While the Court did refer to using the mandate as a starting point for its calculation of whether the District Court's writ was violated, the Commonwealth fails to note that the district court originally gave a 90 day stay to give the state time to comply with its writ but the Sixth Circuit's calculation is based on whether the state acted with 60 days of the mandate being issued. This acknowledges the fact that some time already ticked off the 90 day clock and that the Sixth Circuit's mandate did not reset the clock. Thus, the Sixth Circuit did not actually reset the clock, but restarted it where it stopped when the action was stayed. This is precisely how a stay operates.

The Court rejects the Commonwealth's unusual view of what a stay does. It will adopt the conventional understanding of the effect of a stay and the lifting of one. Black's Law Dictionary defines a "stay" as "1. The postponement or halting of a proceeding, judgment, or the like. 2. An order to suspend all or part of a judicial proceeding or a judgment resulting from that proceeding. — Also termed stay of execution; suspension of judgment." *Black's Law Dictionary*

(9th ed. 2009). *See also United States v. Martin*, 378 F.3d 353, 358-359 (4th Cir. 2004) (""To 'stay' an order or decree means to hold it in abeyance, or refrain from enforcing it." *Black's Law Dictionary* 1413 (6th ed. 1990). Once a defendant requests a trial de novo in North Carolina superior court, the state district court judgment is held in abeyance - it is not executed, nor is it technically vacated.").

The Petitioner also provides a number of immigration cases to support the conventional view of a stay. See *Garcia v. Ashcroft*, 368 F.3d 1157, 1159 (9th Cir. 2004) ("A stay simply stops the clock, rather than adding time to that clock."). The Commonwealth, however, believes they are inapplicable due to their specific context. Even without these cases, however, it is clear that the stay pending the Commonwealth's appeal of the Court's Amended Judgment paused or halted the 120-day deadline imposed by the Court to provide Wolfe a new trial. When that stay was lifted, the deadline clock resumed where it left off when the stay was granted and there were 36 days remaining. On Saturday, October 13, 2012, the 120 days given to the Commonwealth to provide Wolfe with a new trial expired. Because the deadline fell on a weekend, the deadline for retrial moved to Monday, October 15, 2012. The Commonwealth had more than adequate time to seek clarification from this Court on its order or, as what happened in the *Williams* case, to seek more time to reprosecute the Petitioner. It chose not to exercise either option.

Having rejected the Commonwealth argument regarding the effect of the stay, the Court turns to its argument that it has not violated the Court's order. The Commonwealth claims that by instituting pre-trial procedures, it has complied with the Court's option to "within one-hundred and twenty (120) days of the date of this Order, provide Petitioner with a new trial." The Commonwealth relies on *Fisher v. Rose* to defend its position and the Court finds its argument unavailing. In *Fisher,* the district court issued a writ and directed that "issuance of the

11

writ will be stayed for ninety (90) days pending appeal by respondent or, within which time, the

State may on its own motion vacate petitioner's conviction and grant him a new trial." *Fisher*,

757 F.2d at 790.  Based on the language of the district court's order in *Fisher*, the Sixth Circuit

on review found that:

> Less than sixty days after this court issued the mandate affirming the district
> court's granting of the writ, the state had appointed counsel for Fisher, set bond,
> and set a trial date. If Fisher had been able to meet the requirements of his bond,
> he would have been released from detention. These facts indicate that at the time
> of the July 7, 1984 hearing, Fisher was no longer in custody pursuant to the
> constitutionally defective judgment of conviction, but was being held pursuant to
> the indictment.

757 F.2d at 791.  The Commonwealth believes this supports their contention that pre-trial

proceedings are adequate to meeting the requirements of a conditional writ in a habeas case.  It

does not.  The district court's order in *Fisher* and the Court's order in this case are wholly

different.  In *Fisher,* the district court did not direct the state to retry the petitioner within a

certain period of time.  In the instant case, the Court did direct the Commonwealth to provide

Petitioner with a trial within a specific amount of time, 120 days.  Instead, the Court finds a more

recent case from the Sixth Circuit and a case from the United States District Court for the

Eastern District of New York to be more convincing.  In *D'Ambrosio v. Bagley*, 656 F.3d 379,

385-386 (6th Cir. 2011), the state argued, as the Commonwealth does here, that by instituting

pre-trial proceedings, it complied with the district court's writ.  However, the Sixth Circuit

rejected this argument:

> Initially, the warden claimed that the state complied with the conditional writ
> when it commenced proceedings against D'Ambrosio, such that the district court's
> jurisdiction had expired. However, the warden appears to have abandoned this
> argument in her reply brief. Moreover, this argument lacks merit because the
> district court's mandate required that D'Ambrosio's retrial be conducted[2] (i.e.,

---

[2] The district court in *D'Ambrosio* ordered that either the state ""(1) set aside D'Ambrosio's convictions and
sentences as to all counts of the indictment, including the sentence of death; or (2) conduct another trial . . . within
180 days from the effective date of this Order."" *D'Ambrosio*, 656 F.3d at 381 n.1.

completed) within 180 days, not merely that he be granted a new trial within that time period. The warden cites Davis to support her argument for the state's compliance, but that case involved a conditional writ that hinged on granting a new trial, not conducting a new trial like the conditional writ in D'Ambrosio's case. It is clear that the state never conducted a new trial for D'Ambrosio, thus failing to comply with this portion of the writ.

The Sixth Circuit further expounded on its view in a footnote:

Many of the cases that hinge on the granting of a new trial also involve periods of ninety days or less in which to comply, which is obviously less than the 180-day period in this case. This makes sense considering that the district court wanted the state to conduct a new trial against D'Ambrosio within this time and not merely grant him one. In *Patterson v. Haskins*, 316 F.3d 596, 611 (6th Cir. 2003), this court granted the defendant "a conditional writ of habeas corpus that [would] result in his release from prison unless the state of Ohio commence[d] a new trial against him within 180 days from the date of [that] opinion." The state began proceedings against the defendant, but they ended in a mistrial, prompting the state to commence a third trial against him. *Patterson v. Haskins*, 470 F.3d 645, 650 (6th Cir. 2006). The defendant moved the district court for an unconditional writ, arguing that the state had failed to comply with the conditional writ by not completing a new trial against him within 180 days. *Id.* However, this court held that the state had complied with a "fair reading" of its initial opinion, which required only commencement and not completion of proceedings. *Id.* at 668-69. A fair reading of the writ at issue in D'Ambrosio's case requires more than the mere grant of a new trial for compliance.

*D'Ambrosio*, 656 F.3d at 386 n.5 (alterations in the original).

In *Latzer v. Abrams*, 615 F. Supp. 1226, 1227 (E.D.N.Y. 1985), faced with the same question of whether pre-trial proceedings constituted compliance with the district court's directive that the habeas petitioner in the case be "afford[ed]" a new trial, the court found that it had not:

With these considerations in mind, I conditioned the issuance of the writ in the present case on the event that petitioner was not "afforded" a new trial within sixty days. Respondent now argues that the arraignment of petitioner on the sixtieth day was sufficient to "afford" petitioner a new trial within the prescribed period. While the order may not have been the epitome of clarity, respondent's interpretation flies in the face of the order's intent to insure that petitioner was either promptly retried or relieved of the strictures imposed by his constitutionally flawed conviction. The order was intended to mean that petitioner should be brought to trial within sixty days, and will be so applied by the Court.

The *Latzer* Court further notes, as this Court has in this Order, that:

> If respondent had any doubts as to the meaning of the order, he could have sought clarification from the Court, or avoided any potential problems by bringing petitioner to trial before the expiration of the sixty day period. Alternatively, respondent could have applied for an extension of the time for re-trial. Instead, respondent chose to file a notice of appeal, withdraw the appeal, and then seek the indictment of petitioner on five new counts, as well as re-indictment on the count in question. In light of the failure to bring petitioner to trial within the prescribed period and respondent's election not to pursue the options discussed above, I am constrained to conclude that the final writ of habeas corpus must be granted.

*Latzer*, 615 F. Supp. at 1227-1228. The Court finds the reasoning in both the *Latzer* and

*D'Ambrosio* cases highly persuasive in resolving the question of whether pre-trial proceedings in

this case constitute providing Petitioner with a new trial. Just as it was the case in *Latzer*, it was

certainly the objective of the Court in issuing its Amended Judgment that the "petitioner [would

be] either promptly retried or relieved of the strictures imposed by his constitutionally flawed

conviction" and it was certainly the intention of the Court that in "provid[ing]" Petitioner a new

trial within 120 days, said trial actually occur within that period of time. Furthermore, just as

*D'Ambrosio* notes, the Court gave more than the ordinarily prescribed 90 days or less to provide

such a trial, further indicating that the Court intended and expected that the actual re-trial of

Petitioner take place within 120 days of the issuance of the Amended Judgment. Finally, as in

both cases cited here, if there was any doubt as to the meaning of the Court's order, the

Commonwealth could have, and should have sought clarification, which it did not. Taken

together, the Court finds that the Commonwealth failed to comply with its Amended Judgment

because it failed to "within one-hundred and twenty (120) days of the date of this Order, provide

Petitioner with a new trial, or release him unconditionally from custody."

## B. The Appropriate Remedy for the Commonwealth's Violation

Given the Commonwealth's violation, the Court must determine the proper remedy for this violation. It is generally recognized that a violation of a court's directive to retry a habeas petitioner within a certain amount of time would permit the court to order the prisoner's release, however, "the granting of an unconditional writ in this circumstance will not, itself, generally preclude the government from rearresting and retrying the prisoner." Fed. Habeas Manual, § 13:10 (May 2010). However, the case law also reflects that in extraordinary circumstances, a federal district court is permitted to bar reprosecution. *See Satterlee v. Wolfenbarger*, 453 F.3d 362, 370 (6th Cir. 2006) ("[H]owever, in extraordinary circumstances, such as when the state inexcusably, repeatedly, or otherwise abusively fails to act within the prescribed time period or if the state's delay is likely to prejudice the petitioner's ability to mount a defense at trial, a habeas court may forbid reprosecution.") (internal quotations and citations omitted). Furthermore, additional federal courts of appeals have recognized further grounds for baring reprosecution. The most relevant ground to bar reprosecution in this case is best articulated by the U.S. Courts of Appeals for the Eighth and Tenth Circuits. The Tenth Circuit has found that:

> For a federal court to exercise its habeas corpus power to stop a state criminal proceeding "special circumstances" must exist. In general, the constitutional violation must be such that it cannot be remedied by another trial, or other exceptional circumstances exist such that the holding of a new trial would be unjust.

*Capps v. Sullivan*, 13 F.3d 350, 352-353 (10th Cir. 1993) (citations omitted). The Eighth Circuit has held the same:

> A district court has authority to preclude a state from retrying a successful habeas petitioner when the court deems that remedy appropriate. *Burton v. Johnson*, 975 F.2d 690, 693 (10th Cir. 1992), cert. denied, 123 L. Ed. 2d 497, 113 S. Ct. 1879 (1993). Nevertheless, this is an extraordinary remedy that is suitable only in certain situations, such as when a retrial itself would violate the petitioner's constitutional rights.

*Foster v. Lockhart*, 9 F.3d 722, 727 (8th Cir. 1993) (citation omitted). Courts have recognized a variety of constitutional violations justifying barring of reprosecution. *See Solem v. Bartlett*, 465 U.S. 463, 466 (1984) (barring reprosecution because state court lacked jurisdiction); *Smith v. Goguen*, 415 U.S. 566 (1974) (barring reprosecution because petitioner convicted under unconstitutional statute); *Vogel v. Com. of Pa.*, 790 F.2d 368, 380 (3d Cir. 1986) (barring reprosecution due to the Double Jeopardy Clause); *Wiggins v. Estelle*, 681 F.2d 266, 268 n.1 (5th Cir. 1982) (barring reprosecution when pre-indictment delay denies petitioner due process); *Strunk v. U.S.*, 412 U.S. 434 (1973) (barring reprosecution due to violation of Speedy Trial rights).

As a starting point, the Court fully concedes that had the content of the Petitioner's Motion to Enforce Judgment been strictly limited to the Commonwealth's violation of the deadline set in this case, the question of the appropriate remedy would be an easy one. The Court would order Wolfe's release, but he would be subject to rearrest and reprosecution by the Commonwealth. However, the reality of this case is very different than that of the ordinary case which constrains the Court to extraordinary remedies.

Specifically, the record reflects that on September 11, 2012, the Original Prosecuting Team, Prince William County Commonwealth's Attorney Paul Ebert, Assistant Commonwealth's Attorney Richard Conway, and Detective Sam Newsom, again effectively deprived Petitioner of the opportunity to use *Brady* and *Giglio* evidence, just as they did in the original state proceedings. On September 13, 2012, Ebert and Conway recused themselves from the case as prosecutors. Petitioner states that on September 11, 2012 at Augusta Correctional

Center, a meeting occurred in which the Original Prosecuting Team intimidated Owen Barber.[3]

At trial, the Commonwealth had offered Barber as the key witness in support of the murder for

hire charge against Petitioner. Barber subsequently recanted his original testimony before this

Court in habeas proceedings and testified that he was told to falsely testify by the Original

Prosecuting Team, and stated that Petitioner was not involved in the murder of Danny Petrole.

The transcript reflects the Original Prosecuting Team's efforts to get Barber to re-

implicate Petitioner in the murder of Danny Petrole, despite Barber's testimony before this Court

in habeas proceedings. Detective Newsome urges Barber to come up with a "plausible and

truthful explanation" that reconciles the two different versions of the testimony given by Barber

in state court and before this Court, and why his state court testimony was the truth. *See* Sept. 11

Mgt. Tr., 73:6-21. The Original Prosecuting Team also advised Barber that he would now be

subject to the invalidation of his plea agreement with the Commonwealth of Virginia and could

be charged with capital murder since he admittedly lied during the original Wolfe trial in state

court.[4] *Id.* at 16-23. The Original Prosecuting Team implied to Barber that counsel for Wolfe

acted improper and asked whether they made offers of incentives to Barber to get him to change

his testimony. *Id.* at 27-33 (Conway: "Someone must have gotten to you." Barber: "Maybe. I

have No Idea").[5] The Original Prosecuting Team appealed to Barber's family, his religion,

thoughts of Petrole, and a variety of other topics in service of getting Barber to recommit to his

---

[3] On December 10, the Court received a copy of the transcript, as well as a recording, of the September 11, 2012 meeting, and other materials. The Court notes that the Commonwealth conceded that the September 11, 2012 meeting was recorded without Mr. Barber's knowledge. This calls into question the conduct of the Commonwealth.
[4] The Original Prosecuting Team provided a number of Supreme Court opinions to Barber during the meeting and offered him legal advice. It goes without saying that the line between "friendly" legal advice and witness intimidation is laser thin.
[5] Although initially Barber answers that Wolfe's counsel made no offer of incentives, Detective Newsome made a follow up question that was unintelligible, which resulted in a response from Barber regarding his father and leukemia. The Court is unable to determine the full extent of the context of this portion of the conversations between the Original Prosecuting Team and Barber but finds it unsettling. The Court also notes that at numerous other times, responses to particular questions by Barber, or the question themselves, were unintelligible by audio interference.

original testimony that Wolfe hired him to kill Petrole. The Original Prosecuting Team made repeated references to Barber having to make "important decisions pretty soon" and argued that unless Barber reevaluated his testimony, Wolfe would be allowed to "skip" responsibility for Petrole's death while Barber sat in prison. *Id.* at 46-48. As noted during the December 13, 2012 hearing, the Original Prosecuting Team made a number of references to Barber's prison privileges and responsibilities in a manner that creates the impression that they were either under threat or could be subject to enhancement if Barber testified in a manner favorable to the Commonwealth. *Id.* at 50-53.

Perhaps tellingly, when presented with all of these arguments, Barber did not substantially vacillate from his testimony and on a number of occasions suggested that any re-prosecution of Wolfe simply focus on drug changes, rather than Petrole's murder:

> MR. CONWAY: Well, no, I'm not saying that. We can make it happen. What I'm telling you is, you know if you find that - - I'd like for you to be informed before (unintelligible) start shaking down. And we really need to know where we all are at.
>
> MR. BARBER: I would say forget the murder and go for the drugs.
>
> MR. CONWAY: Well I told you we can't do that. We can't do that. Right now you're-- from where we sit and look at the facts, Owen, we got two people who took part, both people took part in the taking of another human life. And we've got one who's convictions, because of what you've done, (unintelligible) and we've got to start all over again. And we've got you who breached a plea agreement and that's back to square one too.

*Id.* at 76. As Mr. Barber's counsel's testimony indicated during this Court's December 13, 2012 hearing, Mr. Barber, under advice of counsel and in consideration of the Original Prosecuting Team's conversation, has now invoked his Fifth Amendment privilege, which the Prince William County Circuit Judge authorized. Hr'g Tr. 39-42, Dec. 13, 2012. As indicated by Barber's counsel, Barber intends to continue to invoke his Fifth Amendment privilege at Wolfe's retrial, absent the granting of immunity. Hr'g Tr. 42-43

In the absence of the discovery violations in the state trial, the Original Prosecuting Team's actions on September 11, 2012 might appear to be benign. However, in context, they speak to a continuing pattern of violating Petitioner right to use *Brady* and *Giglio* evidence, which the Court attempted to remedy through its habeas decree. To provide context, it is important to note how members of the Original Prosecuting Team originally violated Wolfe's constitutional rights in the first place. As the Fourth Circuit notes in its decision affirming the Court's habeas decree:

> The single, plainly momentous item of suppressed Barber impeachment evidence on which we rest today's decision is a written police report reflecting that — before Barber ever asserted that Wolfe hired him to murder Petrole — Prince William County Detective Newsome advised Barber that he could avoid the death penalty by implicating Wolfe. *See* J.A. 4825-27 (the "Newsome report"). The Newsome report documents Newsome's and fellow Detective Walburn's conversations with Barber during an April 14, 2001 cross-country flight, returning Barber to Virginia upon his arrest in California three weeks after the Petrole murder.

*Wolfe v. Clarke*, 691 F.3d 410, 417 (4th Cir. 2012). The Fourth Circuit further expanded on its view by citing the relevant portions of the Newsome report:

> I told Barber that we knew he had killed Petrole and had a very strong case against him. But that as far as we knew he had no personal problem with Daniel Petrole but that he had killed him for someone else and we believed that person was Justin Wolfe. I explained to him that we needed the information that he had in order to arrest Wolfe. I explained again that we had a very strong case against him (Barber) and that we could stop there but that would not be right since we knew it was someone else [sic] idea. I told him that he was potentially facing a capitol [sic] murder charge in this case and that he needed to help himself. He asked me, "What do I get out of it if I tell you who the other person, the higher up, is". I told him I could not make any promises to him, but that the Commonwealth might entertain the idea of not charging him with Capitol [sic] Murder, or that they may be willing to make a recommendation as to his sentence.

> Again Barber asked about discovery and I again explained it to him. He then said, What do I get out it [sic] if I name the "higher up". I told him that was one of his problems; that his case was so tight he really had very little to offer us. I told him it could simply be the difference between Capitol [sic] murder or First Degree, execution or life in prison, or that the Commonwealth may be willing to make a

> recommendation in sentencing after speaking to his attorney. I told him again that the Commonwealth's Attorney would make these decisions and that I could not promise him anything. I pointed out that at this point he would do more good than harm for himself by cooperating with us.

*Id.* (citations omitted) (alterations in the original).  The Fourth Circuit also explains in its opinion that:

> Barber also engaged in the following exchange with the Commonwealth's lawyer during cross-examination:
>
>> Q. You related that several times they had said if you don't tell us what we want, you will get capital murder?
>>
>> A. Yeah.
>>
>> Q. Who is they?
>>
>> A. [Commonwealth's Attorney] Ebert, [Assistant Commonwealth's Attorney] Conway, [Barber's attorney] Pickett, [Detective] Newsome, [and Detective] Walburn.
>>
>> Q. But if my notes are correct, they never told you exactly what to say. They didn't give you a script for the events of that night, did they?
>>
>> A. A specific script for the events, no.
>>
>> Q. They in fact told you what they wanted was the truth, didn't they?
>>
>> A. They said that they know Justin [Wolfe] is involved and that we know that he hired you to kill Danny [Petrole].
>>
>> Q. Well, what they told you they wanted you to tell them was the truth. Wasn't that their statement?
>>> * * *
>>> Wasn't that their statement to you, that they wanted the truth?
>>
>> A. Yeah. I mean, they said they wanted the truth, but at the same time they said that this is what you have got to say or you are getting the chair.

*Id.* at 417-18 (citations omitted) (alteration in original).

The Fourth Circuit also noted in its opinion a significant body of additional constitutional violations discovered by this Court that did not serve as the basis of the court's opinion but which it did not condone or overrule:

> In its Brady Order, the district court also assessed the cumulative materiality of the Newsome report and the seven other items or groups of suppressed evidence that it found favorable to Wolfe. The first category of that evidence — evidence tending to impeach Barber — encompasses the Newsome report, plus evidence that Barber possessed other motives to murder Petrole (the "Barber-Petrole relationship evidence") and that Barber's roommate, Jason Coleman, informed the prosecution that Barber had confessed to acting alone (the "Coleman evidence"). The Barber-Petrole relationship evidence includes statements made by confidential informants and Barber's fellow inmates indicating that Barber knew Petrole before the murder, that Barber owed Petrole money, that Petrole "had a hit out" on Barber, and that Barber had a close relationship with Petrole's roommate. The Coleman evidence revealed that Coleman "had a conversation with Barber after the murder where Barber admitted to [Coleman] that he murdered Petrole and acted alone," and that Coleman reported that conversation to the prosecution, including the Commonwealth's Attorney.
>
> The second category of suppressed evidence — evidence tending to impeach other prosecution witnesses who corroborated Barber's testimony — includes information relating to a deal the Commonwealth made with its witness J.R. Martin in exchange for his cooperation (the "Martin evidence"), as well as a recorded statement made by the Commonwealth's witness Jason Hough in conflict with his subsequent trial testimony regarding his pre-Petrole-murder conversation with Wolfe and Coleman about robbing drug dealers (the "Hough evidence"). Finally, the third category of withheld evidence — evidence suggesting an alternate theory of the Petrole murder — consists of the following: various reports and witness statements relating to a parallel drug investigation that indicated conflict in Petrole's drug business unrelated to Wolfe's purported motive for having Petrole murdered (the "drug investigation evidence"); evidence that Petrole was rumored to be a government informant, constituting yet another possible motive for his murder (the "informant evidence"); and the statements of three witnesses that they saw a second car at the crime scene shortly after the Petrole murder (the "second car evidence").
>
> Having assessed the materiality of the foregoing — the Newsome report, the Barber-Petrole relationship evidence, the Coleman evidence, the Martin evidence, the Hough evidence, the drug investigation evidence, the informant evidence, and the second car evidence — the district court concluded that the evidence's suppression by the prosecution was, by category and cumulatively, patently prejudicial. While we look no further than the Newsome report today, we do not

> condone the prosecution's apparent suppression of other Brady material and the
> pattern of conduct that it reveals.

*Wolfe*, 691 F.3d at 418 n.7 (citations omitted) (alteration in the original).  As this Court noted in

its *Brady* Order,

> In effect, Ebert admits here that his contempt of defendants who "fabricate a
> defense" guides his perspective on disclosing information. This is particularly
> troubling in the case at bar where the record is replete with statements from Ebert
> and Conway regarding the scrutiny and credibility determinations that they made
> (as opposed to the jury) regarding the relevance of any potential exculpatory
> evidence. Essentially, in an effort to ensure that no defense would be "fabricated,"
> Ebert and Conway's actions served to deprive Wolfe of any substantive defense in
> a case where his life would rest on the jury's verdict. The Court finds these actions
> not only unconstitutional in regards to due process, but abhorrent to the judicial
> process.

*Wolfe*, 691 F.3d at 423-424 (quoting *Wolfe v. Clarke*, 819 F. Supp. 2d 538, 567 n.24 (E.D. Va.

2011)).  The centrality of Barber testimony to Petitioner's case has also been expounded upon by

the Fourth Circuit.  It commented that:

> The Commonwealth's argument is belied by the Brady Order, which carefully
> outlined the trial evidence and came to the inevitable conclusion that "Owen
> Barber's testimony was the only evidence that the Prosecution presented to prove
> that [Wolfe] hired Barber to kill Petrole." Upon our own review of the trial record
> in the Wolfe I appeal, we also grasped that "Barber was the prosecution's key
> witness in Wolfe's capital trial and the only witness to provide any direct evidence
> regarding the 'for hire' element of the murder offense and the involvement of
> Wolfe therein." And, the Commonwealth itself conceded at Barber's sentencing
> hearing on his non-capital murder conviction — where he received a sentence of
> just sixty years in prison, with twenty-two years suspended — that "but for
> [Barber's] testimony Mr. Wolf[e] probably would not have been prosecuted." In
> these circumstances, where "the jury had to believe that Barber was credible and
> that his version of events was in fact truthful and accurate in order to support
> [Wolfe's] conviction," the materiality of the Newsome report is manifest.

*Id.* at 424 (citations omitted).

Finally, the Fourth Circuit indicated that it felt "compelled to acknowledge that the

Commonwealth's suppression of the Newsome report, as well as other apparent Brady materials,

was entirely intentional." *Id.* at 423.  As the Fourth Circuit explains:

During Wolfe's evidentiary hearing in the district court, the Commonwealth's Attorney explained that his office does not have an "open-file policy," providing criminal defense counsel access to entire case files. Asked to elaborate, he offered the flabbergasting explanation that he has "found in the past when you have information that is given to certain counsel and certain defendants, they are able to fabricate a defense around what is provided." Additionally, the Assistant Commonwealth's Attorney admitted that he does not produce evidence to a criminal defendant unless he first deems it to be "material[]" and "credib[le]."

*Id.* (citations omitted) (alterations in the original). The Fourth Circuit reminded the Prince William County prosecutors of their previous *Brady* violations in another recent case and hoped that "the Commonwealth's Attorney and his assistants have finally taken heed of those rebukes." *Id.* at 424. As the Court will outline below, it is quite clear that the Original Prosecuting Team did not heed the Fourth Circuit's warning.

At the heart of this Court's habeas relief was a desire to correct the pervasive *Brady* and *Giglio* violations this Court identified, which were affirmed on appeal. As the Court previously recognized:

The Supreme Court has held that both the withholding of exculpatory evidence from a criminal defendant by a prosecutor and the knowing use of false testimony violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See *Brady v. Maryland*, 373 U.S. 83, 86, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *Giglio v. United States*, 405 U.S. 150, 153-55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "Evidence is 'exculpatory' and 'favorable' if it 'may make the difference between conviction and acquittal' had it been 'disclosed and used effectively.'" *United States v. Wilson*, 624 F.3d 640, 661 (4th Cir. 2010) (citing *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)). For a court to find a Brady violation, it must determine that the evidence was 1) favorable to the accused, 2) suppressed by the prosecution (either willfully or inadvertently), and 3) material. *Banks v. Dretke*, 540 U.S. 668, 691, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004). Evidence that is favorable to the accused includes both exculpatory (whether requested by defendant or not) and impeachment evidence. Id.; see United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (holding that the Brady rule includes impeachment evidence).

*Wolfe v. Clarke*, 819 F. Supp. 2d 538, 545 (E.D. Va. 2011).

It was the Court's objective through its habeas decree to remedy any constitutional violations by giving the Commonwealth the option of providing a new trial to the Petitioner. However, the Commonwealth has done the exact opposite and as a result, has incurably frustrated the entire purpose of the Court's writ. Instead of curing the constitutional defects in Petitioner's original convictions, the Original Prosecuting Team permanently crystalized them. Though Petitioner is now aware of the *Brady* and *Giglio* evidence helpful to exonerate him, he cannot use it because the Original Prosecuting Team has scared Barber into invoking his Fifth Amendment right to avoid self-incrimination.

On September 11, 2012, the same Original Prosecuting Team returned to Barber. Using the same subtle but unmistakable coercion, the Original Prosecuting Team attempted to get Barber to recant the testimony he gave before this Court and develop a "plausible and truthful explanation" for doing so. And as before, the weapon the Original Prosecuting Team used to persuade Barber was the death penalty. Because of the Original Prosecuting Team's conduct, Barber has invoked his Fifth Amendment privilege against self-incrimination, and in doing so, has denied Petitioner a credible direct and rebuttal witness to defend himself from the charges he faces. The Original Prosecuting Team's intimidation on September 11, 2012 appears to be consistent with a violation of due process. *See United States v. Saunders*, 943 F.2d 388, 392 (4th Cir. 1991) ("Improper intimidation of a witness may violate a defendant's due process right to present his defense witnesses freely if the intimidation amounts to substantial government interference with a defense witness' free and unhampered choice to testify.") (citations and quotations omitted).

What is clear is that through the actions of the Original Prosecuting Team, Petitioner has been denied the very remedy that would have repaired the numerous constitutional violations this Court found: the ability to call Owen Barber in Petitioner's defense and to use him to rebut other testimony the Commonwealth will put forward.  Given the actions of the Original Prosecuting Team, the *Brady and Giglio* violations the Court found are essentially permanent.[6]  As such, the Court finds extraordinary circumstances exist that warrant barring reprosecution of the Petitioner.  It is clear that any retrial under the present circumstances would result in incurable violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the rights afforded to all defendants under *Brady v. Maryland*, 373 U.S. 83, 86, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) and *Giglio v. United States*, 405 U.S. 150, 153-55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) and well as the Petitioner's Sixth Amendment Right to a fair trial.[7]

## III. CONCLUSION

The Commonwealth, having violated the Court's conditional writ of habeas corpus by failing to "within one-hundred and twenty (120) days of the date of this Order, provide Petitioner with a new trial, or release him unconditionally from custody," it is **ORDERED** that the Commonwealth of Virginia release Petitioner unconditionally, free of all criminal proceedings on the charge of murder for hire of Danny Petrole and the drug charges that were previously tried in state court by the Commonwealth, within ten (10) days of the entry of this order.

It is **FURTHER ORDERED** that the Commonwealth of Virginia is hereby **BARRED** from reprosecuting the Petitioner on the charges originally tried herein in state court or any other

---

[6] The Court considers it unlikely that the Commonwealth would grant immunity to Barber so that he could provide testimony to exonerate Petitioner.

[7] The Commonwealth has argued that any bar to reprosecution of the Petitioner would be a violation of *Younger v. Harris*. The Court has considered the argument and finds it inapplicable.

charges stemming from death of Danny Petrole which requires the testimony of Owen Barber in any form.

The Clerk is **DIRECTED** to send copies of this Order to all counsel of record.

**IS IT SO ORDERED**

UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
December 26, 2012

12/26/12 Copies
mailed to counsel, pst